Case number 22-1101 et al. Alabama Municipal Distributors Group et al petitioners versus Federal Energy Regulatory Commission. Mr. Matthews for the petitioners Healthy Health and Sierra Club. Mr. Elliott for the petitioners Alabama Municipal Distributors Group et al. Ms. Benta for the respondents. Mr. O'Neill for the respondent interveners. Good morning, Council. Mr. Matthews, please proceed when you're ready. Thank you, Your Honor. Good morning. Nathan Matthews on behalf of the petitioners Healthy Health and Sierra Club. This case challenges the Evangeline Pass Pipeline Project, which supplies gas to the Flockman's Liquefied Natural Gas Export. Evangeline Pass is one of five different FERC has prepared relating to this terminal. Evangeline Pass would supply roughly a quarter of the terminal's gas supply. I'd like to discuss three issues today relating to connected actions, indirect effects, and climate, and I'd also like to briefly address remedy. On connected actions... What was the last thing you said you'd like to briefly address? What was the last thing you said? Remedy. On connected actions, FERC argues that the terminal and the pipeline are not connected because they are not interdependent. This is factually incorrect. The terminal needs the gas that the pipeline would supply. The EIS found that there was no existing or proposed pipeline that could provide a substitute. FERC found that if they had to construct a new pipeline to replace Evangeline Pass, it would be 175 miles at an added cost of $1.4 billion. Can you clarify what you mean by needs? I was confused about this in the brief too. The terminal is getting gas from multiple pipelines, and if it doesn't get gas from this pipeline, are you saying the terminal doesn't work? Or it doesn't work at full capacity? It doesn't work at full capacity. I mean, the terminal works to export gas, and so it can't export gas without... So that pipeline is really not required? Well, the terminal was proposed to FERC as a pipeline that would take 3.8 million per day of gas and then export it. So the project, as contemplated by FERC, can't go forward. If they were only going to build a pipeline... But the terminal... I think you've already answered it. The terminal will serve a purpose, even if there's no... Even if this pipeline isn't one of the pipelines it feeds into. The terminal could... Portions of the terminal could run without this pipeline. You could build half of it and only use half the supply. But there is no way to do the full proposed and without the full volume of gas, if you can... And just on this topic, it's just a clarification question. I think it's page 5 of your reply. I could be misremembering. There's this really helpful... Yeah, it is page 5 of your reply. The graphic? Yes. It was very... Find them a reply. Thank you for it. But the numbers don't quite add up, and I wondered what's that all about? I don't know. It would have been very helpful if FERC had given us a graph like this, a map, a diagram, anything else in any of these five FERC dockets. My suspicion is that that balance of gas may be burned in the Gulf Express pipeline to power the compressor that then moves to get... But I don't know. Okay. So we... Factually, the terminal cannot do everything it said it's going to do without this gas, and it's not a spare change of the margin, more than a quarter of the gas that the terminal needs. But even if FERC was right that the terminal did not strictly depend upon the pipeline, interdependence is just one of the three regulatory definitions for connected actions. Clause 2 of the regulation says that actions are connected where one, quote, cannot or will not proceed unless other actions are taken previously or simultaneously. And FERC has explicitly adopted CEQ's rights on this. At 18 CFR section 380.1, FERC says we're going to follow all the CEQ rights. But FERC never addressed that regulatory text in its orders. I didn't explain why it doesn't apply here during its brief, but it's clear that it does. If Evangeline passed, it would not go forward without the terminal. It serves no other purpose. And where this court has rejected segmentation arguments, the court has found each segment has substantial independent utility. So if Evangeline Pass has no substantial independent utility, that itself clearly distinguishes from all of the prior segmentation cases. Can I ask you a question about significance? Of greenhouse gases? Yes. Yes. Imagine I look at the significance discussion in this EIS, and I compare it to the significance discussion in Center for Biological Diversity, last term's case out of Alaska. And I think the discussion was more thorough in this case. Does that mean that you lose on significance? No, you don't. Tell me why. Because in this case, FERC provided a very different rationale for not discussing significance than in the Center for Biological Diversity. Say that again. FERC's rationale for not making a significance determination here is very different than what FERC articulated in Center for Biological Diversity. In particular here, FERC did not claim that it had no way to determine significance. FERC pointed to its pending policymaking to say that we are still figuring out the best way to do it. But FERC did not claim we can't or we just don't know how. We haven't decided how yet. And FERC cites no authority, and I'm not aware of any, that says the promise to do better in a now, where the agency hasn't given an explanation to why it can't make it now, just saying it would rather wait until later. As to social cost of carbon particularly, the court, or FERC here also didn't articulate two of the three arguments that were at issue in Center for Biological Diversity, as we explained in our briefs. But I don't think that the court needs to reach social cost of carbon arguments because of the importance of FERC's concession up front that just had not decided how to make a significance determination. So what if FERC had not gone down the road at all? Is your argument predicated on the idea that there was the initial rule and then it was converted basically to draft status? No. That would have, or presumably would have needed to offer a different rationale as to why it wasn't making a significance determination here. But we don't argue that the requirement to decide whether greenhouse gases are significant or how significant they are arises from FERC's rule. That comes from the NEPA recs. It says agencies must evaluate the significance of effects. And it has consequences. I mean, it's not just we want to know. FERC typically requires mitigation for significant effects. Whereas FERC has said for greenhouse gases in the past, the reason they are not requiring mitigation is because they don't know whether the greenhouse gas emissions are significant. When it's reviewing alternatives, FERC typically will not require an applicant to adopt an alternative unless that alternative would offer a significant environmental advantage. So I do think there's value in FERC just stating a position of did we think that these emissions were something to worry about or not. But it can also change the contours of the rest of FERC's analysis. And so that's why we think FERC had the obligation to say something about whether or not the greenhouse gas emissions, whether we're talking direct emissions or emissions from the connected actions or indirect, whatever scope we're using, FERC has to take emissions in that scope and say if they're significant or not. And here FERC said, well, we plan to do that. We've talked about a couple of ways we could do it. And we'll get back to you. But then they went ahead and approved this project without actually meeting the obligation that they had already met. I'd like to circle back to connected actions for just a moment and address FERC's argument that the cumulative effect analysis somehow meant that there was no need to discuss connected actions. Excuse me, Mr. Matthews, for a moment. What's your FERC's experience with actually determining that something is or is not significant, that the emissions are? FERC has only actually made that determination in a couple of cases. One is the northern natural case that we described where FERC said, in that case, we don't know where the line between significance and insignificance is, but we're confident that this project is on the insignificant side of it, where the emissions were so low that that solved the issue. Here, if FERC is required to consider either connected actions or indirect effects, then I think FERC could make the converse argument very plainly. FERC has proposed a threshold of 100,000 tons per year. If we're looking at the connected actions, but still the direct effects of FERC infrastructure, we're already talking millions of tons per year. If we're looking at the whole life cycle effects, FERC has said that a pipeline that moves one-two hundredth of the gas of Evangeline Pass would have enough life cycle emissions to cross that 100,000 tons per year threshold. Maybe FERC doesn't know if it should be 100,000. Is that to say that the northern case is as close as they've ever come to actually saying? FERC is extraordinarily reluctant to actually take a position on this. I believe there's been one or two other subsequent cases like northern that said, this is too small for us to worry about, but otherwise, FERC has not taken a position one way or the other. And has survived challenge in northern in any other case? I don't believe anyone has litigated the cases where they actually made a determination for emissions. So it sounds like they've been hesitant or waiting or refusing whatever for a long time. This has been, yes, this refusal has been a long-standing position of FERC, but that FERC's rationale has changed, and it changed dramatically when we published the draft greenhouse gas policy. But I will say that Evangeline Pass is not a one-off. All of the other FERC decisions that were issued during that year, I think, also made the same argument about we are going to just figure out a way to do this sometime, but we haven't figured it out yet, so we're not, or we haven't decided on which way to use yet, so we're not deciding significantly. Now they can say they're waiting on CEQ. I mean, CEQ has encouraged agencies to go ahead and make that decision already while waiting for final guidance, or CEQ has said you could use the social cost of carbon as one way to do it. CEQ hasn't set a threshold for a certain dollar value of monetized greenhouse gas emissions, not to the significance. This isn't the first case where someone has argued that the agency had to adopt the social cost of carbon metric. Has any agency done that? It's not just FERC. Lots of other agencies use the social cost of carbon in project-specific reviews, as FERC has recognized. We cite FERC orders in the briefs where FERC acknowledges that maybe the Bureau of Land Management, the Forest Service, other agencies use social cost of carbon in their review, NEPA review, for individual projects, but FERC has refused to do so. Thank you, but you don't think they need to, you don't think we need to get to the social cost of carbon anyway? No, I mean, I think social cost of carbon is a great fallback option for FERC, but we at FERC wanted to use its $100,000 per year significance threshold, and FERC wanted to adopt some other threshold. FERC just needs to make a decision so that we then can know, okay, well, when are projects going to require certain mitigation? When FERC approved this project, was its overall publications balancing based on the conclusion that greenhouse gas emissions here were nothing to worry about, or instead, did FERC have to decide? These were a big problem, but the project is so important that it's worth it anyway. Once FERC picks a way to do it, then maybe we won't like that, but if we challenge that, that'll be challenging the application of its expertise and judgment, and it would be reviewed under a different standard or different case than FERC's complete refusal to make a decision now. So the agency could come back as far as you're concerned now and say, well, as we've said, we've looked at this in relation to and taking that into account, this is insignificant. End of story. CEQ has encouraged agencies not to do that. So CEQ has said just saying that an individual project submission for a small percentage of the state or national totals is not a good way. But they're not bound by CEQ. No, they're not. So part of your argument that this... We think that FERC should not do that, and depending upon what FERC did, perhaps we would challenge that, but then FERC would be in a position of having made a decision and defending it rather than having refused to make a decision. And I do think that the fact that FERC is refusing to make a decision here is somewhat telling. If FERC really thinks that these are nothing to worry about, FERC should say it. For whatever reason, FERC is uncomfortable saying that, and I think the point of NEPA is to force agencies to ask these hard questions and just divulge their thinking to the public. The public should know whether FERC thinks that individual projects just aren't a problem for climate because they're a small part of the total, or public should know if FERC thinks otherwise. Well, they haven't said irrelevant. They've simply said, I can't trace any consequence from a project level. It's a starting point. FERC hasn't said you can't trace any consequence. They've said we can't trace it to direct physical effects, so they've said we don't know how many millimeters of sea rise we're going to get from this. But FERC's current position is that the social cost of carbon is valid. FERC's only criticism of the social cost of carbon right now is to say there's not a threshold at which monetized impacts become significant, but FERC does not dispute that the social cost of carbon is an accurate reflection of how much harm is going to be caused by greenhouse gas emissions. And in this case, is that $137 million? A ballpark, something like that, yeah. Okay, thank you. Looking just at the emissions from the direct infrastructure here. If you use a bigger scope, it's much clearer if you look at indirect or connected action. But it's not just construction? It's not just construction? No, infrastructure. The pipeline compressor stations during the whole life of the project operate in a min. I see that I'm out of time, and I made it through the first three points. If there are other questions, I'm happy to answer them, or we can... We'll give you a little bit of time for rebuttal, Mr. Mathews. Mr. Elliott? May it please the court, I'm Randolph Elliott on behalf of the Alabama Municipal Distributors Group and the other municipal commissioners. Sometime next year, Southern Natural Gas Company will file new rate rates. Under the orders on review here, FERC has ruled that Southern can design those rates to overcollect its total cost of service. Southern, that's an uncontested fact. FERC approved, in this case, a lease of Southern's expansion of its pipeline capacity, a lease of that expanded capacity to its affiliate, Tennessee Gas Company. Now, this is what's called a cheap expansion, because the incremental costs of expansion are much lower than the pipeline's existing average cost, not half, but less than that. According to the record here, as Southern leased the capacity to Tennessee at a negotiated lease rate, it's about 25% higher than the incremental cost. Lower than the average cost, but higher than the incremental cost. FERC ruled that the excess lease revenue above the incremental cost can be kept by Southern Natural Gas when it next determines its rates. It doesn't have to reconcile all of its costs and revenues, and then the next rate creates two separate buckets. As a mathematical certainty, this allows Southern to over-recover its total cost of service. Now, we ask... But not at your expense, right? Pardon me? But not at your expense. Well, yes. I mean, Tennessee and its customers don't object to the lease rate. Our contention is that in the next rate case, you have to look at all the rates, all of the costs, and all of the revenues, and reconcile them, because a fundamental tenet of rate is the cost of service, and not anything more. That might make perfect sense going forward. I'm not sure, but I don't understand why it has anything to do with monies that have been captured during the current rate term. Yes. In other words, if the carrier made a... Got a windfall from an investment in some stock issuance, it wouldn't be down to your benefit. They would keep it. If they realized a higher rate of return on their equity than was anticipated because of economies they could realize, they get to keep it. So how is this any different? That's true. What we're saying is in the next rate case, though, where they reconcile all the projected costs of service, all the projected revenues, you do take into account what's projected. Well, that's going forward again. That's our only contention. Your whole argument seems to be you want credit for the 21 million that's going to accrue before the next rate case. No, no. The pipeline intervenors accuse us of asking for that, but that's not what we ask. Well, then clarify. It works very clear in the re-hearing order, paragraph 18, what we ask for. A credit of the excess of these revenues in the next rate case, or in future rates. You mean to say any revenues that will be captured after the next... once the Section 4 case begins from this spur under lease? Right. Yeah. No, we're not asking for an immediate capture of the windfall. And why is that timely now? Why is that... Why is that timely now? Why is that timely now? You raised that in Section 4. No, we addressed that, I think, in our discussion about standing, which nobody challenged. I understand you can address it. And FERC ruled with certainty that's how Southern is supposed to design its rates in its next rate case. It didn't leave that issue for determination in the next rate case. It's a race to Ducati, if you will. And because that is an impending harm to us in the next rate case, it handcuffs us from the arguments we can make. With legal finality, we can challenge it now. In fact, we fear that if we waited and challenged it later... We read FERC as saying that in your later Section 4 case, they will not take into account the carrier's revenues from serving customers other than the munis. Exactly. That is amazing. And that is what they ruled. You keep two separate buckets of costs and revenue. Can you point that out? I'm sorry I didn't come across this. I'm sorry. Where do I find that in the FERC order? Well, it's selfish, if you will. But the paragraph 63 of the certificate order says that in the next rate case, that's where they reject our request for the revenue credit. It says, Southern, we will require that during the term of the last sentence... What page are you on? I'm on page 27. 27 of the... Of the joint appendix, which is paragraph 63 of the order, page 27 of the order. The last sentence says, we will require that during the term of the lease with Tennessee to reflect in its system rates any of the costs associated with the lease asset. Earlier in that paragraph, you say, and no revenue credit. So you're saying that's for 20 years? That's for 20 years. And the rehearing order doubles down on that rationale. And I realize your request is for credits from the over the revenue in excessive costs on this new spur, but it follows, does it not, that any debits would follow, would go to you as well, right, under your theory? Well, there's a catastrophe on the line, the contract is breached, and they get out of it, the shipper gets out of it, and the line, or the LNG plant blows up, and there are no revenues. Right. Just costs. Well, at that case, you know, in the next rate case, they would have to adjust the rates. At your expense. On you, your technology, that that would be on you? Well, what they have, what they have said is that all the costs, no, what they said is that all the costs and the risks of the expansion are on the pipeline. That's a key part of the rule. But you want the costs and the revenues both to be on your, to your benefit or detriment. We're not trying to get a windfall here. What we're saying is that there can't be any over-recovery of costs. You have to reconcile all the costs and revenues. Okay, but about an under-recovery of costs? Under-recovery of costs. Means your rates will go up, correct? The costs and revenues have always traveled together. Right. Right? I mean, we look back through all the changes that have occurred here, and whether they were, you know, specifically announced in Gulf South and all that. They've always been together. Well, this order says that no, that rule no longer obtains, at least with respect to the costs. And, and we said, but what about the revenues? The excess revenues? I mean, I mean, if the pipeline wanted to lease some incremental capacity at a low-cost rate and eat the difference, it's free to do that. But that, that shouldn't come back to us. We can't, we can't subsidize the, the expansion. That's clear from PERC's order, and they claim we're not allowing that to happen. That's paragraph 25. I think you don't want to take the risk. But also paragraph 57. Okay. That's a fundamental tenet of, of PERC policy. We claim that, that right. We should not subsidize this capacity. Let me explain to you why we are subsidizing that. Let me just do a mathematical hypothetical here that I think, I mean, suppose a pipeline has a rate, average cost of a dollar. It doubles its capacity at an incremental cost of just 50 cents per unit. So now its average cost is 75 cents. It leases that expanded capacity for 60 cents. So it's a dime more than the incremental cost. Under PERC's rule here, the customers, my clients, still pay a dollar. The lease capacity is sold at 60 cents. What does that do? I mean, the pipeline recovers 180, I mean, 80 cents average cost. More than its 75 cents actual average cost. So it's getting revenues more than its cost by keeping the two buckets separate. Allowing the pipeline to keep the excess lease revenue. We didn't say, go back, I mean, originally we said, your standard policy is to roll in a cheap expansion like that and charge everybody 75 cents. PERC didn't, wouldn't do that. They said no. So we said, well, all right, fine. If you're going to keep the lease rate at 60 cents, at least credit the excess revenue back to the total cost of service. So that we don't subsidize the lease. And in my hypothetical, the extra dime goes back to the original cost of service. Customers charge 90 cents, not a dollar. Lease is still 60 cents. Those get off their nose. 90 cents and 60 cents, that produces the average 75 cents. Pipeline recovers its total regulated cost of service, which is sufficient. PERC has found that it would be sufficient to attract capital, provide an adequate, reasonable return. We're held harmless because now we're not subsidizing the lease. And the pipeline's rate payers are not collecting, in effect, through the back door, a higher rate of return than they're allowed. That's our argument. We're not saying you've got to roll it in and give us a windfall. We're just saying, don't allow us to subsidize the pipeline's rate of return. Total up all of the pipeline's costs and revenues in the next rate case, as you always do. It's subsidizing the quickie in a sense, as you're suggesting. It's not coming out of your pocket. You're claiming, I guess it's an opportunity cost to you. I think that's fair, if I understand your question. Maybe this hypothetical can't happen. But imagine that things go haywire as a result of this expansion, and the average cost in your hypothetical, instead of going from $1 to 75 cents, goes from $1 to $1.25. The pipeline, the PERC orders hold the pipeline at risk for the expansion cost. You wouldn't happen. Cost overruns, they're explicit about that. So you are looking to have your cake and eat it, too. You want to pay less if the average costs go down, but you don't want to pay more if the average costs go up. I don't feel like we're trying to have our cake and eat it, too. But what about the bottom line? Is it true? Tell me if this is right or wrong. You want to pay less if the average costs go down, but you don't want to pay more if the average costs go up. That's what PERC's policy holds. No, but what do you want? Yes. Right, that just seems like the debt is a windfall. Because you're not willing to take the risk of the increased costs. No, I mean- You just want to bank the increased revenue. Yeah, in my hypothetical, we would be taking that risk if we said everybody should pay 75 cents. Let everybody's float or Pfizer float as the costs come. That's not what we're arguing. We're arguing if there is lease excess lease revenue, uncontested there will be. If heads, you win. If tails, they lose. No, well, I would argue that the present PERC order is just the other way. The pipeline is to pocket the excess lease revenue at the customer's expense. The thing is, you're not the relevant customer in that situation because the costs aren't coming from you either. Well, if you'll allow me, I mean, that's a fallacy. Because the expansion here is a compressor station and three metering stations. Not zero miles of pipeline. We're not constructing a new pipeline, you see. It's not even a lease of facilities. It's a lease of the capacity of the existing pipeline system. The expanded capacity is made possible by the equipment, the compressor, if you will, that enables a reverse flow on the pipeline. But it's the existing pipeline infrastructure that's being used. And they're not that incremental rate that 70 cents, seven cents that they talk about compared to the lease rate. That is based only on the cost of the compressor and the metering station. It doesn't include any of the pipeline. So they're building this expansion capacity, if you will, on our backs. Okay. Pipeline capacity that we've already paid for, or are paying for in our current rate. Let me make sure my colleagues don't have additional questions for you. In fact, in terms of the nature of the subject. Okay, thank you. We'll give you a little time for rebuttal and then we'll hear from the commission now. Mrs. Vanta. Good morning. I'm Carol Vanta for the commission. I'll begin with the lease issue. I think the court understands it pretty well. There is no subsidy here. And I don't think that we had an argument raised that these customers were subsidizing it. They do want the revenue. But I don't think this argument that we just heard, I don't recall seeing that. You don't what? You don't what? I don't recall seeing the argument made that they are actually subsidizing this service. The orders and the briefs talk about the new lease capacity that's being created by the new facilities, the compressions and the metering stations and so on. And in this case, as the court understands, the Tennessee as the lease, the lessee is, or I should say southern as the lessor is bearing all the risk. If anything goes wrong with this, if the contract falls through, something happens. The general system rate payers, I should say the petitioners here are transportation service rate payers. We're paying the system rates that are designed and have been designed in the past to pay for the service that they receive. The lease capacity is a property interest that will be held by Tennessee. It is not transportation service. Very clear lease capacity is a property interest. It has different rights than transportation service. It has different billing than transportation service. So what the commission did in this case was approve the lease and the rates for the lease capacity. That has no effect on the transportation rates that system service customers such as the petitioners are paying. Say they're fully enslaved to mini-risk if something goes wrong with this lease transaction, that is on southern. It's between southern and Tennessee and the municipals and the other system transportation service rate payers are not paying for that. And so the commission said, as your honors said, that the costs and the revenues go together. The general transportation service customers paying system rates are not entitled to the revenues from the lease capacity because they aren't paying the costs for the lease capacity or bearing the risk. So that's the commission's position on this issue. Has this been the, this distinction between property rights and services in the commission's position in past proceedings? Yes. Yes. I think it goes all the way back to the certificate policy. To which? Oh, the, I think it's in the policy or the lease policy that we discussed in our brief, which both go back some decades. Yes. And certainly. 2007. Well, yeah, probably even before that, but the commission clarified in Gulf South and in subsequent cases. And I don't think anyone can point to a case after that Gulf South in 2007, where the commission hasn't segregated the costs and revenues from the lease. Separate. On the theory that this is a property sale of property rights. I'm sorry? That the lease is a transfer of property rights. It's a property interest, yes. That is the theory underlying everything from Gulf South forward? Yes. And the commission, I think, explains that among other places in the certificate order at JA 21, 22, 23 talks about what a lease is, how it differs from transportation service. It is a property interest that the lessee holds, but it also comes with fewer rights in some respects than from transportation service with regard to secondary points, capacity release, things like that. It is a different animal, and it is treated as a different animal. So no more questions on the lease? Is it possible to lower the podium just a little more? Because I think if the microphone's below you, that voice carries comes through a little more. Is that better? I think so, as long as you speak into it. Yeah, thanks. I can also speak louder. I often do. So with respect to the connected actions, this court has- Just stay with us for a second. So if there is a catastrophe such that the property that's been leased is unusable, that loss falls entirely on the lessee? I think it falls on the lessor, on Southern, and whatever agreement they have with the lessee to cover that. Yeah, I don't know the exact terms. The point being that the risk is entirely on the lease side between Southern and Tennessee and not on the system rate payers, exactly, the transportation service rates. The ins and outs of who exactly would bear that catastrophe as between Southern and Tennessee, I'm not sure, but I can speak to that. I can tell you that it would not be the system rate. So with regard to connected actions, I think looking at the body of cases, Delaware Riverkeeper 2014, City of Boston, and other cases from this court, the Evangeline pipeline is functionally and temporally separate from any of the other projects. They aren't all tied together. It serves the terminal as a customer, but the terminal was already approved before this project was proposed. Or I think it was approved before it even held its own season to determine what pipelines might serve it in the future. Now, interestingly, I don't think there was even a recurring order challenge in the terminal approval proceeding, and there was no appeal from that. So the terminal was approved on the environmental impact statement and was approved before it found the pipelines to serve it, and then they separately proposed their projects to serve it using different transportation networks, different sources, different tasks, and they're different companies. They just all contracted with the same customer. But they are not linked to that in the sense that you would do an environmental impact statement. Now, that said, in this environmental impact statement for the Evangeline project, it did include the information about the terminal from its environmental impact statement in the discussion of cumulative impact. Who did that? Was that the DOEs? No, no. I mean, the DOEs... You included the environmental analysis of the terminal, right? Right. Didn't DOE do that? Well, the commission had to approve the construction of the terminal under its authority under Section 3. It prepared the environmental impact statement. DOE was a cooperating agency in the terminal impact statement and, in fact, adopted that as its own in its order 4446 and did its own analysis, but it cooperated in the preparation and adopted and then expanded upon the environmental impact statement for the terminal. And that was just the construction of the terminal, not the continued operation? Right. That's it. But it is actually... That is a separate proceeding. DOE is also a cooperating agency in that one. So DOE was a cooperating agency in the terminal impact statement and in the... I don't remember if it's an impact statement or an environmental assessment. Whatever is being done for the terminal amendment, DOE is a cooperating agency in that. And we'll use that in its opinion regarding increased exports. As to Evangeline Pass, DOE is not a cooperating agency because it already approved the exports, so it's not involved in this. But the commission, as part of preparing a full hard look at this project, in the Evangeline Pass analysis, included anything that came before and even other projects that were ongoing. So in the environmental impact statement, it included information about the terminals from that prior impact statement. It included information about the Columbia Gulf East Lateral Express Pipeline that had been proposed. It included that, I think, both in the environmental impact statement and in the order. And then later, when Texas Eastern proposed its Venice Extension Project, which is still under consideration, the commission looked at the draft environmental impact statement from that so that it could address fully any potential cumulative impacts in the rehearing order. So the information it discusses in the cumulative impact section of the rehearing order, it draws upon the draft environmental impact statement for that other pipeline. So the commission did take a full hard look at any potential cumulative impacts, but that is not the same as saying that these are connected actions that must be treated on a single proceeding. What is the practical difference between those two? I'm not sure, honestly. I mean, the commission is just trying to take a hard look overall, so I don't know exactly what it would be expected to do differently were it to treat any or all of these actions as connected. But if we look at the environmental impact statement discussion of the East Lateral Express Project, and if you look at the rehearing order talking about the draft impact statement in the Venice Extension order, the commission takes quite a hard look at it, points out actually some of these facilities aren't even physically near each other for a lot of the geographically confined considerations, because none of these connect to the terminal. To clarify, the terminal has its own pipeline that was approved in its proceeding, the Gator Express. It has two legs. So those are the feeders to the terminal. None of these projects connect to the terminal. They all feed into that, into Gator Express, and not even in the same places. So one of the legs of Gator Express was to connect with the Tennessee system, including some capacity that was already there, and then now this capacity in the Evangeline Pass Project. The other leg was to connect with Texas Eastern, and that's where Venice Extension will connect. The Gator leg connected to Columbia Gulf, so Columbia Gulf on the East Lateral Express is building to it and will join on the same platform where it's connecting with Texas Eastern. So you have Texas Eastern and Columbia Gulf at one platform. You have Tennessee connecting at the end of the other leg, Gator Express. So they're all building to the project, but they're all separate companies with separate contracts and separate agreements with the terminal for what to provide, and being built on different timelines and in different physical areas. And they don't link up as in like the Delaware River segmented. In the City of Boston case, which is quoted in the rehearing order here, it says, the test asks, this is a test of substantial independent utility, the test asks, quote, whether one project will serve a significant purpose even if a second related project is not built. What purpose would the pipelines here serve, Evangeline and so on, if the terminal had not been built? Well, we do concede that while the terminal is independent from whatever pipelines it serve it, we don't contend that Evangeline Pass doesn't depend on the terminal existence. The terminal, of course, was already approved before this proceeding even began. Right, but the Evangeline depends upon there being a terminal there to serve. It does, but we don't have... So how does it meet the test of something that would have been built even if the other portion, the terminal, had not been built? Well, we don't have a case that addresses this. We don't know whether that independence has to be both ways. We don't have a case that says that if it's just one way, that that can't count. If we look at all the factors, like the timing, the function, the commercial and financial independence, and all the other factors, it's not simply does it depend on that, but what does it have in common with it? Here's what the commission said in Food and Water Watch. Actually, it's the court speaking about the commission. The commission reasonably determined that the projects have independent utility, i.e., that, quote, quoting the commission, one project will serve a significant purpose even if a second related project is not built. Close quote. Commission found that each project would have gone forward absent the other. You can't say that here. No, but here we have the second project. We're not talking about the first project and something that needs to be built later. We are talking about the second project. So we can see that we don't have a case. What do you mean, that one's later than the other? Is that it? What's that? I'm not sure of your point, that one here comes later than the other? Well, it's just not that we have a project in front of us that depends on something else to be done in the future. This is something. Right, it's been done. It's been done. But the question is, I thought the question was, would these pipelines have been built had there been no terminal, to which the answer would be no. I think we have to say the answer there is no, but I don't think that's the end of the inquiry. We don't have case law on point for that, but we do have all the factors that the court considers. And it is a balancing test, because in food and water watch, the temporal issue there was equivocal in the court's words, but the other factors that you look at on balance made it appear to be not connected. And so we do look at things like the function, the commercial and financial. Again, these pipeline projects are separate from each other, separate companies, separate paths, and everything. They did all contract with the same end customer. They're not being built by Venture Global. They're not owned by Venture Global. They're just someone who contracted with the terminal to deliver to it. And again, the court did note in the city of Boston, among other cases, that if we don't know, for instance, when we're looking at the terminal, if we don't know what pipelines are going to be involved, the court's language was later projects can fully account for the cumulative impacts when those effects become better known. And that's where the commission demonstrates the rigor of its analysis here, in that it made sure from the cumulative impacts to consider every possible one of these projects as information about them became known, to the extent that in the recurring order, all we had was a draft environmental impact statement for Venice extension. And the commission still devoted something like seven paragraphs to discussing it. So you're not aware that that analysis would have differed in any way if the various projects were treated as connected? I think that's right. I don't think it would have been different. So from the commission's perspective, there's nothing at stake, actually, in the connectedness inquiry. I mean, whether you have to do it over would be, but... Well, I wouldn't want to have to think through what impact it might have for other cases. But I think as far as considering whether the commission met its obligation to take a hard look, it did, whether we want to call it connected or call it what it looked at and how it analyzed under the cumulative impact. I think the point is that the commission fulfilled its NEPA responsibility. And then you mentioned a couple of times that part of what feeds into the commission's perspective that there's non-connectedness here is that they're separate companies. Mm-hmm. And are there other cases in which, even though they're separate companies, the projects are still treated as connected? Not in the key precedents that I am aware of, the ones that we looked at. Boston, Food and Water Watch, I don't... I'm not aware of one in different... And still treated as connected. It tends to come up when it's the same company and they've got several projects and maybe they're near each other, even if they're not lined up. And that's where it comes up. So it is one of the facts. And it goes to the functional prong, functional discussion. And the commission alluded to... I mean, it did say something about not being the same company in, I believe, paragraph 40 of the requiring order. I know I looked at paragraphs 40 and 42 where the commission is suggesting that that is one of the indicators that it was. I mean, and it just makes sense when you're comparing it to something like Delaware River where it's one company that was marketing it as a single big one. And you don't take issue with the proposition that in order to operate it to achieve its full potential, that all of these various project leaders are coming from different companies, that the inputs feed into the full potential? I know that's certainly why the terminal contracted with them. I can't categorically say that it couldn't get the least capacity or some kind of secondary occasionally from someone else if it was cheaper because it does have interconnects with different systems. But certainly, it did enter into these contracts with the intention of being able to maximize and maximize its options because they are different systems. They're bringing gas from different places. There may be times that they're getting more from Tennessee, which draws not only from the Appalachian region, but it can connect with the mid-continent system in Oklahoma. Maybe it has access to something that Texas Eastern doesn't or wherever Texas Eastern is bringing its gas from. So I think any business is going to want to have options. But we don't have a finding here about what percentage of the terminal capacity. Does it have to be running 100% 24-7 to mathematically make sense? Or is there some amount lower than that? We don't have that data. I don't think there's any basis to assume that it'd be running flat out 100% all the time. But we just don't know that. Can we just talk a second about effects unless there's further questions about this? So can you just tell us what's the current status or do you have a sense of what the current status is on the review of the 100,000? It's ongoing. I don't know that there's been any updates since what we have where it was reverted to draft status. And the fact that it's still ongoing, we think it further supports what the commission has been saying about the difficulty of this. The fact that the commission is continuing to grapple with these issues and consider ways to add even more to its environmental analysis, it just shows that the commission is trying to be rigorous about this and responsive to what the court has required. We believe that the analysis in this case does everything that this court has required in past cases or found the commission deficient for not doing. The commission quantified the emissions with aggressive maximum assumptions and compared it to national and state and regional emissions and goals. And it did discuss the social cost of carbon and it still continues to find that not appropriate for the commission to make object level analysis. But it is still considering ways to do that. I mean, it did do all the things that you said it did, but then at the end of the day, it didn't tell us how much that matters. And that seems like it's a pretty significant... I'm not concluding whether that's necessary or not, but it's hard to say that that's immaterial because the whole point of it is for an agency to lend its expertise to the community. What I can point out is that in both paragraph 98 of the certificate order and I forget exactly where in the hearing was, the commission did say that overall considering everything looking at this project, this is an environmentally acceptable action. And another thing I would note is that all five commissioners at the time agreed, even if they didn't necessarily agree on every aspect of how or why, there were no dissents on this project. Isn't the determination of significance a statutory obligation? Well, it is with respect to performing, whether you do an environmental impact statement, which of course we did. I think the commission has to include this discussion, but I don't think the court... I thought the regulation uses the word significant too. You have to discuss. I think it says you have to discuss the significance. Right. And the commission discusses as much as it can here, but the court... I mean, it's hard to say it discusses a lot of things that would inform significance. Yes, but it has not determined whether or how to make that ultimate determination if it needs to. And I don't think there's a case where this court has said that it has to and that this analysis doesn't represent a hard look. What's your response to the petitioner's argument that you do need to? He says you just need to make a decision. Well, that's all well and good to say, but we don't have a court case that says we have to take that step. And the commission is... What is your argument for why this court should not say that in this case? Because the commission still doesn't believe it has a tool that is appropriate for that, and it is trying to determine whether it can be appropriate, whether that or some other tool would be appropriate for that, but it isn't there yet. And the commission is a bipartisan body that has to come to some kind of, if not consensus, at least a majority. Maybe petitioner would say until you figure it out, you just can't certify things. I don't know what the support for that is, so I... Why is that wrong? These are not hostile questions. I'm giving you the opportunity to make your case. And I think the commission's answer has just been, we just don't have a tool to do that, but we take a hard look at this project, and we still think it's an environmental issue. And he might say, the petitioner might say, just don't certify anything until you figure it out. I don't know what the basis for it... I mean, if the commission takes a hard look under NEPA, then it's fulfilled its NEPA... That's question-begging there. His point is, you can't take a hard look until you have figured it out. Well, I disagree with that. Yeah, I mean, because... Why do you disagree? Whether or not a project, a particular project, whether its emissions level are significant, whatever that might mean, I think the commission doesn't think that ultimate finding is necessary to be able to make a finding that something is in the line.  I'll stop. I can't supply something beyond what the commission itself says. You must think that it doesn't matter as long as there's a conclusion in paragraph 98. I mean, that has to be the commission. Well, what paragraph 98 tells us is that all five commissioners found this environmentally acceptable. Right, and so it has to be that you think that as long as there's a bottom-line conclusion that it's environmentally acceptable, that it doesn't matter if there's a sub-conclusion as to the significance of some aspect of that. I think that's right. I've got to not be committed. Otherwise, you would lose, right? Yes. Isn't significance also the criterion for moving past the environmental assessment to go on to an EIS? Well, of course, and here we did that. I understand that, but there must be some criterion by which we decide whether to do that. Yeah. I don't know what the commission, when the commission took the policy statement back to draft, it said it wouldn't apply it in currently pending cases, but it still did the environmental impact statement here anyway. And I believe it did with other similar projects. I know it did with East Lateral Express. Sometimes it doesn't do an EIS in some things that it determines don't have a significant impact, right? So it must be some criterion that's using to say some EAs present a significant and some an insignificant. It does, and I don't know what those are because it didn't bother with that here because it just went to the environmental impact statement. And the language that the commission used at the time, I'm not sure whether I have it here, but the commission said that, because initially it did do an environmental assessment for this project, and then it issued a notice, which is in the record. I just don't remember, here it is, day 333, where the commission said staff will prepare an environmental impact statement. It will assist the commission in its consideration of the project's contribution to climate change and its decision-making process to determine whether the project is in the public needs and necessity. And that just reflects the commission striving to comply with a number of discourse cases and giving the robust discussion of all the different facets that it had not done in the environmental assessment. So it made that determination in this case, even though it explicitly was not applying the policy of being the 100,000 or more. It went ahead and did it in this case regardless. So it sounds like what the commission is doing is there's some situations in which the commission thinks it's just insignificant, and then there's other situations in which the commission thinks we can't just say at the threshold that it's insignificant, but we're also not going to say whether it's significant. And for those cases, it's just going to do an environmental impact statement to cover itself. Is that essentially what's going on? I do know that in the only case I'm aware of, and Council's suggestions, there might be a couple others who may be there. I do know in the Northern Natural case, the commission went ahead and did it in that case, and it was an insignificant finding because the numbers were minuscule. I think if you add the construction and operation of that pipeline, it's about a tenth of the construction and operation of the damage that we've had. So there is some amount like that where the commission, at least the commission at the time, said this isn't even worth arguing about. In answer to Judge Gisbert's question, the commission's making a determination of significance in some cases because it's saying in some cases that it's just too insignificant. If it's patently so tiny that it's insignificant, maybe that's an easy call. Right, but it's not the converse of that. It's not something that the commission has been prepared to do, and it's not something that the court has been compelled to do. Even at Northern Natural, that was the commission choosing to do it there. It wasn't because it was compelled to. Again, I would point out, unlike many of the projects that the court sees, all five commissioners at the time agreed in both orders, even as they differed as to how they would answer. All right, make sure my colleagues don't have additional questions. We'll hear from the intervener. Mr. O'Neill? Okay, please, the court, my name is Brian O'Neill, and I represent the Respondent Intervention Committee. By way of status, as I mentioned before, this is the Plaquemines LNG project, so the construction has been fully approved. It's been fully funded, $21 billion, and expected in service dates in the fourth quarter of 2022. Could you speak up a little, or could we turn the volume up a little bit? Something is not coming through. I'll try to speak louder. Thank you. In any event, and in addition, the pipeline construction, at least with respect to the Tennessee and Southern, they expect that the construction will be in tune with and complied with in service dates next year with respect to the Plaquemines LNG facility. I'd like to touch upon a couple of issues with respect to each of the positions for review here, following up on the connected actions discussion. I think it's important for the court to understand the reasoning behind the need for connected actions in some cases, and that's to avoid the segmentation by an agency in order to avoid environmental review, the segment project, discrete sections, and therefore avoid the overall environmental impact statement requirements. Here, we have environmental impact statements. If you take into account all of the projects that the commissioners have raised here in Ledger Connection, all of those projects have been the subject of final environmental impact statements, and indeed, with respect to the Evangeline Pass project, there was an environmental analysis, a draft environmental impact statement, and a final environmental impact statement. And in that case, and with respect to the other cases, the cumulative analysis took into account the Plaquemines facilities, the Gator Express pipeline facilities, the incident facilities for the court, as well as the other considered actions in connection with the Texas-Eastern proposal, the Columbia proposal. One has to wonder, therefore, if connected, if there were to be a requirement that this be deemed to be a connected action, what more would have to be done? And I don't know what it is. All I can tell you is that the commission here has fulfilled its needful obligations with respect to each of the projects that has been reported. And I'd point out also that two of the projects, the Plaquemines LNG facilities that were approved along the Gator Express pipeline, those are final actions that are not appealed. Similarly, the Columbia project that is one of the other links, one of the other supply links to the Gator Express pipeline, also has been approved by the commission, and that is a final action, it's no longer subject to appeal. Once again, one wonders, therefore, what is it that would need to be done? The only, with respect to the connected actions argument, and the only case that commissioners have been able to get to is the Delaware River Basin, and the facts there are significantly different than what's before the court in this case. Well, Steve, the regs make, or maybe it's the statute, differentiate between connected and cumulative effects. And in discussing this, you actually slid from talking about connectedness to talk about the cumulative effect. What is the difference? Well, as I pointed out, that's what I think is important for the court to recognize. The need for consideration under the connected action requirement is to consider all of the facilities in one environmental impact statement, rather than dividing the projects up into discrete. That's not the case here. That was the case, however, in the Delaware River. Well, if here, the commission were remanded to take a connected view of everything, at the very least, I suppose it would mean that whatever the emissions for each of these properties is, would be added together, correct? I would say perhaps. And so it might be, it might be very different, might cause a very different view of whether something is significant, if the something is this whole package, rather than some piece of it. Well, the commission, as I pointed out, did do an environmental impact statement with each of them. And in addition, with respect to significance, it's somewhat of a straw man here. If the commission makes the determination that there is significance, if you will, what that means underneath is that they have to do an environmental impact statement. That's precisely what the commission did here with respect, not only to the Edging the Pass project. So the significance determination in the sequence of events that runs from doing an significant enough to an EIS, that's the only time where significance comes into play? Well, under NEPA, it's what the extent of the environmental review has to be, if there is a significance determination. And that's moving, as Your Honor pointed out earlier, from an environmental analysis to a full environmental impact review, which is, as I said, which has been done here. I guess this was a misimpression. I thought that they made that determination, it's significant enough to do an EIS, and then have to determine at the end of the EIS, is this a significant effect on the environment? But you're saying, no, that was already determined in the decision to make an EIS. I believe that's right, Your Honor. All right, well, we'll get Mr. Matthews in on that, too. Well, may I have a moment to address the other issue? If you don't, just a minute. It'll be very brief. I think it's important on the capacity lease. The commission's policy, which has been followed consistently, is to treat leases as a property transaction, not as a rate for transportation. Here, we have brand new capacity that's been created, capacity that none of the shippers on the southern system want or need, including the commissioners here. So the fact is that they have been treated consistently. The commission treated this consistently with its policy. It has put the risk on Southern Natural Resources, the risk of all the costs, and has segregated the cost of the revenue from the cost of service associated with the development of rates for the existing customers. There's just no implication here with respect to the capacity lease on any of the rates, including the rates paid by the commission. And that's just an important distinction that I think seems to have been missed here. Also, I'd point out, in our brief, we cited the case, the National Fuel case, which is on all fours with all situations for the commission. We treated it precisely the same way. We were criticized by a couple of petitioners for an alleged post-hoc rasterization. The commission considered that most of their order ended up going wrong. I know we're running long on time, but can I ask you the question that I asked FERC with regard to the climate impact, the climate significance? It seems to me the petitioners are saying FERC has just got to make a decision, some decision, and that can then be critiqued or assessed. And until they do it, I guess FERC should just not approve any projects. They have to figure this out first. There cannot be a hard look until they make a decision about what is significant. What is your response to that? I'd answer it this way. I think here, the fact is that the commission did decide to do a climate impact case. That's what's required. In essence, therefore, in these cases, the commission has, without announcing, actually reached the conclusion that there is a significant climate impact factor here, and it needs to be addressed by virtue of the current environment. That's right. Okay. Thank you, Mr. O'Neill. Mr. Matthews, we'll start with three minutes for rebuttal. Thank you, Your Honor. I'd like to first address what would have been required in the Connected Action and Missing from Cumulatives. FERC interprets cumulative actions to only include effects that overlap in time and space. FERC explains that in the EIS at JA 440 here. So, for wetlands, for example, FERC looked at the analysis of the Evangeline Fast Pipeline and said, this is in a different watershed than the other projects that are at issue here. And FERC concluded that the wetlands impacts will not overlap, so it didn't discuss the wetlands impacts of the other projects because it said they're happening someplace else, no one is simultaneously exposed to the same effects, the JA 443 to 444. We're not challenging that as adequacy of that as applied to cumulative impacts, but Connected Action says, fine, maybe they're in a different watershed, but if you approve one project, that still makes the other one more likely to happen. You need to be aware of that before you start going down that road, before you open the barn door. And that big-picture approach is especially important because on the benefits side, FERC is looking at the big picture. It's not drawing a line between the benefits provided by the pipeline and the benefits provided by the terminal. In explaining why the pipeline was in the public interest, the terminal said that it will enable exports, stimulate jobs in gas production, that it'll help US balance the trade, all these other effects that the pipeline only provides if it is going to a terminal that then exports the gas. Those statements are JA 12 and 86 to 87. So, FERC is going to say, when it looks at any piece of this project, here are the benefits that a big enterprise provides, and those outweigh the harms of this individual segment. Then it moves to the next segment, it says the big-picture benefits still outweigh the individual harms. It moves to the next segment, it says the big-picture benefits outweigh the individual harms. It's not making an apples-to-apples comparison, and so that's why, even if they don't overlap in the same watershed or if the air pollution doesn't hit the same communities, FERC needs to look at the total amount of the impacts of the Connected Actions before it approves the individual projects. I'd also like to just address indirect effects. I know we didn't discuss that briefly, but we're happy to rest on the briefs for explaining why this case is more like Sable Trail and City of Overland. But there's an easier way to address indirect effects and the obligation to go upstream, which is that, as I said, FERC is arguing that this pipeline is in the public interest because it will support jobs in gas production. So, if FERC is going to say that we can look at the benefits of gas production, FERC can't  of that additional gas production as well. On climate significance, are you going to... I'm happy to go there. So, I've been kind of describing your argument, and I'm describing it inaccurately, so... Put a little nuance on the argument, is that we don't think that FERC requires, or that NEPA requires FERC to do the impossible. So, if FERC has to either make a decision one way or the other, or say that it can't, if FERC said there really is no way for us to... Why is it not good enough for FERC to say, we can't yet? Because FERC hasn't even said we can't yet. FERC hasn't said when... FERC has said, we've got a menu of options, and we haven't chosen which one to pick yet. And the orders here are explicit about that. And then Commissioner Glick's concurrence says, the only reason I'm joining this order is because we are not saying we don't know how this has significance. So, I'm joining it because we're saying we're not going to do it, you know, or we're still picking the best way. So, that is... So, you think we can't yet would be okay? I think that if they say, we really can't, it's like, you know... I don't know what's the difference between really can't and can't. I'm just trying to get to... So, can you explain why? Like, what's coming? So, like, if this case was in 2010, and there hadn't been the interagency working group on social cost of carbon, they said, we don't know how to do this, but, like, once we get some numbers from TEQ, then in future cases, maybe that would be a method, but it's not available now. But, like, it wouldn't... NEPA wouldn't necessarily require FERC to come up with numbers for what the social cost of carbon could be in isolation. And even that's a bit of an overstatement, because part of the reason social cost of carbon was developed was in response to the Center for Biological Diversity versus National Highway Safety Transportation Administration case, where they said, actually, you do need to come up with a way to figure this out. Mr. Matthews, if, as I was just given to understand or misunderstand, the significance question arises in determining whether to go beyond an environmental assessment to an EIS. They've done that here. Why do they need to say anything else? So a separate NEPA regulation... So the threshold question of whether to prepare an environmental impact statement is, are there going to be any significant impacts? It doesn't have to be, did you point, you know, they could have said, well, this is going to have significant wetlands impacts, therefore we're doing an EIS. That doesn't entail any conclusion about whether the greenhouse gas impacts are significant. What compels that determination? There's a separate regulation. I want to say it's 1502.16. It's in our briefs. And we cite it when we're responding to the intervener's argument that says, once you're in the EIS for every individual effect, you need to discuss the significance of that individual effect. And FERC's practice is that significance determination, the significance of individual effects matters because of the shapes and contours of how FERC addresses mitigation alternatives, et cetera. Maybe I can clarify what you were asking. Why did FERC do the EIS here and reluctantly give FERC some credit? The regulations at the time said that an EIS was required unless FERC could affirmatively conclude that all impacts were insignificant. In this case, and possibly a little bit before in 2021, FERC, after much urging from our part of, I can't say we necessarily get the credit, recognized that if it was not going to take a position as to whether greenhouse gas emissions were significant or not, I believe FERC explained that that was the reason why it was then switching to being an environmental impact statement, because it couldn't make the affirmative finding of insignificance for all impacts. Thank you. Do colleagues have additional questions at this time? I guess not. Thank you, Mr. Matthews. Mr. Elliott, we'll give you two minutes for your rebuttal. Thank you. I wanted to touch on the question of property. It came up in the Council's argument. The property interest here is a right to inject gas at certain points, remove gas at certain other points from the southern natural gas, existing pipeline system. The capacity lease here, section 2.2, page 213 of the Joint Appendix, is quite explicit on this. It's not a lease of facilities, it's a lease of capacity rights. So the property interest is this inchoate interest, inchoate right to inject and remove gas from the existing pipeline system. There's no lease of facilities in the accounting treatment, which is in Exhibit Y to the application, and it's addressed in paragraph 68 of the certificate order. That's Exhibit Y, page 243 of the Joint Appendix. There's no transfer of property, so there's no property being transferred to southern Tennessee. The rate base of southern natural gas is going to still contain 100% of its pipeline. Nothing's being transferred to Tennessee. That's part of the subsidy that we're, existing customers, are essentially doing. The rate base for the other bucket of costs is just the compressor and the metering station, 171 million dollars. So that's, there are two buckets of costs, but there's two rate bases, but the interest really, the pipe, the bulk of the costs of southern natural gas is staying with the existing customers. So talking about a transfer of property to Tennessee is not really true. Well, if I lease three floors of a 10-story building. I'm sorry, I didn't quite. If I lease three stories of a 10-story building, don't I have a property right? You have the property right to transfer. I can use it, I can fill it, I cannot fill it? Yes, yes, but it's a right to use the existing pipeline facility, that's still in the existing customer's rate base. And that's the nature of the incremental service. I mean, Perk's argument basically is that these prices are not cost-based, and therefore our rate-making policies don't apply. But they really never draw the line, we're not challenging the lease price. They can lease it at whatever price they can, or, you know, want to agree with the lessor and the lessee. The second issue is, what do you do with the lease revenue when setting cost-based rates? And that's where Perk never addresses the issue. The precedent, Rockies Express and Natural says, credit the revenues to avoid trouble recovery, over-recovery. Those have never been over-recovered. Make sure my colleagues don't have additional questions at this time. Okay, thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan, Walker, Ginsburg